WHITE *v.* FIRST ELECTRIC COOPERATIVE CORP.

5-1983                    327 S. W. 2d 720

Opinion Delivered October 5, 1959.

*Mehaffy, Smith & Williams* and *Robert V. Light,* for appellant.

*Riddick Riffel,* for appellee.

J. SEABORN HOLT, Associate Justice. Appellant, Buster White, while in the employ of appellee, First Electric Cooperative Corporation, was injured in the course of his employment, on June 21, 1956. Appellee's insurance carrier, Employers Mutual Liability Insurance Company of Wisconsin, on the day following the injury began paying compensation to White at the prescribed rate of $35.00 per week, along with proper medical care through February 10, 1958, a period of 85 4/7ths weeks, in the total amount of $2,139.29, it having been determined and agreed that his healing period had terminated on February 10, 1958. Appellant had a permanent 25 per cent disability. On February 20, 1958, appellant stipulated that his healing period had terminated and asked the Workmen's Compensation Commission for a lump sum settlement of the remaining 112 1/2 weeks beyond the healing period, amounting to $1,685.77, and this sum was allowed and paid to him on the basis of a 25 per cent permanent partial disability, being the remaining compensation to which he was entitled because of that disability. Up to this point a total of $4,837.77 had been paid to appellant.

In April 1958, proceeding under Section 26, Sec. 81-1326 of 1947 Ark. Stats. Supp., appellant asked the Commission for additional benefits on the grounds that

he had experienced a change in his physical condition since February 20, 1958, that is, that there had developed in his spine pseudarthrosis, defined as a "false joint," as a result of operations performed to correct his original injury. On June 12, 1958, a hearing was had before a Referee of the Workmen's Compensation Commission and on September 5th, appellant's claim for additional benefits was denied. On appeal to the full Commission, after reviewing the evidence before the Referee and some additional testimony, the Commission, on December 8, 1958, found that appellant had not shown a change in physical condition which would warrant additional benefits, but stated that, "claimant might be helped by a course of physiotherapy given over a period of about one month" and directed appellee to provide such treatment which it immediately did. Thereafter, the appellant appealed to the Circuit Court of Pulaski County from the Commission's decision denying his petition and on May 15, 1959, that court affirmed the order of the Commission and this appeal followed.

For reversal appellant says: "The central issue presented by this appeal is whether there is substantial evidence in the record to support the finding of the Commission that the claimant did not sustain a worsening of his condition subsequent to February 10, 1958, which would entitle him to a resumption of payments and medical treatment under the terms of the Workmen's Compensation Act. Specifically, the question is whether there is substantial evidence to support the finding that claimant did not have a pseudo-arthrosis at the site of the second operation." In short, says appellant, the issue presented "resolves itself into the question of whether there was a pseudo-arthrosis (false joint) at the site of the operation."

Under our long established rule, if we find any substantial evidence in the record to support the findings and order of the Commission and the judgment of the trial court, we must affirm. "Under our Workmen's Compensation Law the Commission acts as a trier of the facts—*i.e.*, a jury—in drawing the inferences and

reaching the conclusions from the facts. We have repeatedly held that the finding of the Commission is entitled to the same force and effect as a jury verdict," *Wren* v. *D. F. Jones Construction Company*, 210 Ark. 40, 194 S. W. 2d 896.

After a careful review of the evidence presented, we have concluded that there is substantial evidence that appellant did not sustain a worsening of his condition subsequent to February 10, 1958, and did not have pseudarthrosis at the site of the second operation. The evidence is in conflict.

Due to the accident suffered by appellant on June 21, 1956, the evidence shows that he received an injury to his back diagnosed as a ruptured intervertebral disc. In an effort to correct this condition, he was operated on at his employer's expense, and a metal object, or button, placed in his back. This operation appeared unsuccessful since the metal object corroded and on June 11, 1957, Dr. Hundley, orthopedist, performed a second operation to remove the button and to fuse the two vertebrae adjacent to the area. This operation was designed to make appellant's back, at this level, rigid. After approximately 9 months' convalescence, Dr. Hundley released appellant from his care on February 10, 1958, it being Dr. Hundley's opinion that appellant had reached a point where he no longer needed medical care but that because of his injury and subsequent operations, he estimated that appellant had a permanent partial disability of 25 per cent to his body as a whole. On July 1, 1958, x-rays were made of appellant by Dr. Barton A. Rhinehart, roentgenologist. Dr. Rhinehart's report on these x-rays contained this recital: "The films show a spinal graft between the 5th lumbar and second sacral segments. The graft appears to be solid and there is no evidence of motion between the 5th lumbar and first sacral segments. Light motion, however, is present between the 4th and 5th lumbar segments. Conclusions: Spinal grafts with immobilization between the 5th lumbar vertebra and the sacrum, motion is present between the 4th and 5th lumbar segments."

On July 24, 1958, Dr. Rhinehart, at the request of Dr. Wm. L. Steele, orthopedist, made additional x-rays of appellant in an effort to ascertain if a true pseudarthrosis existed and on this second examination his report was as follows: "Anteroposterior standing erect views of the lumbar spine and pelvis were made both with the patient bending to the right and bending to the left. When these films are superimposed there is no evidence of motion between the 4th and 5th lumbar segments and between the 5th lumbar and first sacral segment. Spinal grafts of osseous density are visible between L-4 and S-1. Lateral views were taken in flexion and extension positions. When these views were superimposed no evidence of motion can be seen between L-4 and S-1. The spinal graft appears to be well affixed and shows no evidence of pseudarthrosis. Conclusions: Bone graft between the 4th lumbar and first sacral segments with no evidence of motion on these films."

After examining appellant and considering Dr. Rhinehart's x-ray findings, Dr. Steele testified: "In summary then, this patient has a long standing low back difficulty, instituted while at work, followed by multiple surgical procedures within a two year period. As near as I can determine, the physical findings and history reveal outstanding low back stiffness, complains of low back pain and occasional leg pain, however, not accompanied by any outstanding evidence of muscle atrophy or outstanding nerve root distribution sensory defects. This is in an obese patient who is, understandably, by this time, poorly conditioned to the effects of operative procedures, and x-rays of which only suggest, but to my mind do not definitely prove, the presence of a pseudarthrosis. The idea of any surgical procedure would be to make him better than he is at the present time. Therefore, to me the presence of a pseudarthrosis would have to be more apparent than it is to me now. Secondly, the patient would have to lose weight and gain some mobility of his back; since none of these conditions are met at this time I would not recommend any surgical procedure."

Dr. Hundley, who as indicated, had performed the fusion operation on appellant, and had observed and treated him for nine months prior to February 1959, after reviewing the reports of Dr. Rhinehart, stated: "I think it is conclusive that there is no definite pseudarthrosis of this man's spinal fusion, and certainly at this time there would be no reason to entertain the idea of performing a bone graft as of present status." It thus appears that of the physicians who examined and treated appellant to ascertain whether he had pseudarthrosis, one physician offered by appellant gave it as his opinion that appellant had pseudarthrosis, while Dr. Hundley testified, in effect, that none was present and Dr. Steele testified, after examining the appellant and the x-rays, that he was unable to find the presence of pseudarthrosis. Both Drs. Hundley and Steele testified that additional surgical intervention was not warranted in view of their examinations of appellant.

As indicated, we cannot say that the above testimony on behalf of appellees was not substantial and therefore, the judgment must be and is affirmed.

JOHNSON, J., dissents.

JIM JOHNSON, Associate Justice, dissents. The issue presented here is whether there was substantial evidence in the record to support the findings and order of the Commission and the judgment of the trial court. The question to be resolved is whether claimant had a change in his physical condition.

For reversal, appellant says: "The central issue presented by this appeal is whether there is substantial evidence in the record to support the finding of the Commission that claimant did *not* sustain a worsening of his condition subsequent to February 10, 1958, which would entitle him to a resumption of payments and medical treatment under the terms of the Workmen's Compensation Act. Specifically, the question is whether there is substantial evidence to support the finding that claimant did *not* have a pseudo-arthrosis at the site of the second operation." In short, "Whether there was a pseudo-arthrosis (false joint) at the site of the operation."

The healing period was terminated February 10, 1958, by Dr. Hundley on the premise that the last operation had been successful and that the bone graft was sound. In July, Dr. Carruthers found it to be so unsound as to recommend immediate surgical correction. Dr. Steele found a suggestion of a pseudo-arthrosis. Dr. Hundley is uncertain relative to the existence of sufficient bony material in the graft and relative to the existence of a pseudo-arthrosis.

Appellant argues: ''Where in the record can support be found for the Commission's finding of an unchanged condition? The appeal turns on the question of whether there is a *change in condition for the worse* which either was not present when the healing period was terminated, or if present, was not known to, nor considered by Dr. Hundley in terminating the medical healing period. Dr. Hundley had terminated the healing period on the premise that the operation had been a success — that it had resulted in a sound joint. If then, a pseudo-arthrosis developed, that is an undesired and unexpected *change of condition.*'' (Emphasis supplied).

The essence of the medical testimony is that Dr. Steele and Dr. Hundley frankly admitted that they didn't know whether a pseudo-arthrosis had developed. Dr. Carruthers definitely testified that there was a pseudo-arthrosis. In *Easton* v. *H. Boker & Co.*, 226 Ark. 687, 292 S. W. 2d 257, this Court quoted with approval the following language of Judge Sanborn:

> ''A reviewing court however, is not always required to accept as substantial evidence the opinion of experts, 'Where it clearly appears that an expert's opinion is opposed to physical facts or to common knowledge or to the dictates of common sense or is just speculation, such an opinion will not be regarded as substantial evidence.' ''

On December 8, 1958, the Commission found that claimant had not shown a change of physical condition which would warrant awarding him additional compensation benefits. However, it did state that ''claimant might be helped by a course of physiotherapy given over a period of about one month.'' The Commission directed respond-

ents to provide such physiotherapy which respondents immediately provided for appellant.

It is to be inferred from the above facts that the Commission believed, and based their award upon such belief, that the claimant had sustained a sufficient change in condition to justify the medical treatment ordered. Therefore, the Commission's finding that he was in need of medical treatment for which the respondent is liable is inconsistent with, and does not support the order and award denying additional compensation payments.

For the reasons stated above, I respectfully dissent.